1  STEVE M. DEFILIPPIS
2  State Bar #117292
   PICONE & DEFILIPPIS, APLC
3  625 N. First Street
   San Jose, CA 95112
4  (408) 292-0441



5
   Attorneys for Petitioner,
6  EMERY MILLER

7
                **IN THE UNITED STATES DISTRICT COURT**
8                **NORTHERN DISTRICT OF CALIFORNIA**

9  In re                                    Case No.

10 EMERY MILLER,                            [San Mateo Co. Sup. Court Case
          Petitioner,                       #58303; Cal. Ct of App.
11                                          Case # H029322; Cal. Supreme Ct.
          vs.                               Case # S146829]
12
   BEN CURRY, Acting Warden,
13
          Respondent,                       ***PETITION FOR WRIT OF***
14                                          ***HABEAS CORPUS***
          On Habeas Corpus.                 ***(28 U.S.C § 2254)***
15 _____/

16 BOARD OF PAROLE HEARINGS,
   ARNOLD SCHWARZENEGGER,
17 Governor,

18
          Real Parties In Interest.
19 _____/

20         Petitioner, Emery Miller, a state prison inmate, by and through his attorney, Steve M.

21 Defilippis, hereby petitions this Honorable Court for a writ of habeas corpus ordering his discharge

22 from all forms of state custody, both actual and/or constructive, or alternatively, compelling the

23 Board of Parole Hearings[1], hereinafter "Board," to conduct a parole consideration hearing and find

24

25 _____
   [1]  Note that an enactment by the Legislature and Governor, effective 7/1/05, changed the Board of Prison Terms'
26 name to ***Board of Parole Hearings***. The new Board is comprised of Governor-appointed Commissioners who will
   hear all parole matters, both juvenile and adult. Individual Commissioners, however, are appointed to hear either
27 adult or juvenile cases, so the day-to-day procedure for the determination of parole of adult, indeterminate-term
   offenders is virtually unchanged.
28                                          1

TABLE OF CONTENTS……………………………………………………………...i

TABLE OF AUTHORITIES…………………………………………………………..ii

PETITION…………………………………………………………………………1

JURISDICTION  ……………………………………………………………………2

INTRODUCTION……………………………………………………………………2

2. Willis v. Kane………………………………………………………………5

STATEMENT OF THE CASE………………………………………………………10

STATEMENT OF FACTS……………………………………………………………11

LEGAL CLAIMS……………………………………………………………………16

DENIAL OF DUE PROCESS………………………………………………………16

REQUEST FOR EVIDENTIARY HEARING…………………………………………22

SUPPORTING EXHIBITS……………………………………………………………23

PRAYER……………………………………………………………………………23

VERIFICATION………………………………………………………………………25

FEDERAL CASES

Willis v. Kane, __ F.Supp.2d __, 2007 WL 1232060 (N.D. Cal. 2007) .................................. 6, 8
Willis v. Kane, __F.3d____ [2007WL123060] (N.D. Cal. 2007) .................................................. 8

CASES

(2002) 95 Cal.App.4th 358 ..................................................................................................... 9, 17
26 Cal.4th 616, 658 (2002) ......................................................................................................... 16
Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003) .......................................................... 8, 11, 16, 21
Board of Pardons v. Allen, 482 U.S. 369, 376-78 (1987) ........................................................... 17
Carey v. Saffold, 536 U.S. 214, 221-223 (2002) .......................................................................... 4
Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1,7 (1979) ..................... 17
In re Dannenberg, 34 Cal.4th 1061 ...................................................................................... 16, 17
In re Elkins, 144 Cal.App.4th 475 (2006) ............................................................... 9, 11, 17, 21
In re Lee, 143 Cal.App.4th 1400 (2006) ............................................................................ passim
In re Ramirez, 94 Cal.App.4th 549 (2001) ......................................................... 11, 17, 19
In re Stanworth, 33 Cal.3d 176 (1982) ................................................................................... 16
Martin v. Marshall, 431 F.Supp.2d 1038 (N.D. Cal. 2006) ................................... 9, 11, 17, 21
McQuillion I, 306 F.3d 895 (9th Cir. 2002) ..................................................................... passim
Nino v. Galaza, 183 F.3d 1003, 1006 (9th Cir. 1999) ................................................................ 4
People v. Rosenkrantz (1988) 198 Cal.App.3d 1187 .................................................................. 9
Roper v. Simmons, 543 U.S. 551, 125 S. Ct. 1183, at 1195-1196 (2005) .................. 4, 5, 17, 19
Rosenkrantz I), In re Rosenkrantz (2000) 80 Cal.App.4th 409 ........................................... 9, 17
Rosenkrantz IV), In re Rosenkrantz (2002) 29 Cal.4th 616 ...................................................... 9
Rosenkrantz v. Marshall [Rosenkrantz VI], 444 F.Supp.2d 1063, at 1085 (C.D. Cal. 2006) passim
Sanchez v. Kane, 444 F.Supp.2d 1049 (C.D. Cal. 2006) ......................................... 8, 11, 17, 21
Scott II], 133 Cal. App. 4th 573 (2005) ............................................................... 8, 11, 17, 21
U.S v. Guagliardo, 278 F.3d 868, 872 (9th Cir. 2002) ............................................................. 20
Wolff v. McDonnell, supra, 415 U.S. 558 ................................................................................ 17

FEDERAL STATUTES

18 USC §2254 ............................................................................................................................. 3

STATUTES

28 U.S.C § 2254 ................................................................................................................. passim
California Penal Code §3041 ..................................................................................................... 16
Penal Code § 3041 ............................................................................................................... 19, 21
Penal Code § 3041(a) .................................................................................................................. 9
Penal Code §§3041 ................................................................................................................... 11
Penal Code §3041 ........................................................................................................... 11, 18, 19
Penal Code §3041(b) ................................................................................................................. 24
Penal Code §3041.2 ................................................................................................................... 11

RULES

California Code of Civil Procedure § 446 ................................................................................. 26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATE REGULATIONS

Cal. Code Regs., tit.15, § 2402(d)........................................................................................ 18, 19
Cal. Code Regs., tit.15, §2400 .................................................................................................... 21
Cal. Code Regs., tit.15, §2401(d)................................................................................................ 21
Penal Code §3041 and Cal. Code Regs., tit.15, 2402 ................................................................. 19

REGULATIONS

Cal. Code Regs. tit. 15. §§2400 ................................................................................................... 11
Cal. Pen. Code §3041.................................................................................................................... 17

STEVE M. DEFILIPPIS
State Bar #117292
PICONE & DEFILIPPIS, APLC
625 N. First Street
San Jose, CA 95112
(408) 292-0441

Attorneys for Petitioner,
EMERY MILLER



FILED

JUN 11 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

In re

EMERY MILLER,
          Petitioner,

vs.

BEN CURRY, Acting Warden,

          Respondent,

          On Habeas Corpus.

                       /

BOARD OF PAROLE HEARINGS,
ARNOLD SCHWARZENEGGER,
Governor,

          Real Parties In Interest.

                       /

**Case No.**

[San Mateo Co. Sup. Court Case
#58303; Cal. Ct of App.
Case # H029322; Cal. Supreme Ct.
Case # S146829]

***PETITION FOR WRIT OF***
***HABEAS CORPUS***
***(28 U.S.C § 2254)***

Petitioner, Emery Miller, a state prison inmate, by and through his attorney, Steve M.
Defilippis, hereby petitions this Honorable Court for a writ of habeas corpus ordering his discharge
from all forms of state custody, both actual and/or constructive, or alternatively, compelling the
Board of Parole Hearings[1], hereinafter "Board," to conduct a parole consideration hearing and find

---

[1]  Note that an enactment by the Legislature and Governor, effective 7/1/05, changed the Board of Prison Terms'
name to ***Board of Parole Hearings***. The new Board is comprised of Governor-appointed Commissioners who will
hear all parole matters, both juvenile and adult. Individual Commissioners, however, are appointed to hear either
adult or juvenile cases, so the day-to-day procedure for the determination of parole of adult, indeterminate-term
offenders is virtually unchanged.

him suitable for release. In support of this verified petition, Mr. Miller respectfully alleges the following:

### JURISDICTION

This petition is addressed to this Court's original habeas corpus jurisdiction because the issues raised are of Federal Constitutional dimension, questioning the legality of the Petitioner's confinement and any subsequent release on parole, pursuant to 28 *United States Code [USC]* § 2254. On December 13, 2006, Petitioner exhausted his state remedies when the California Supreme Court's denial of review became final. No other federal challenge has been filed to the 2004 Board hearing that is at issue herein with this Court. Mr. Miller sought a writ of habeas corpus in the Santa Clara County Superior Court, on May 27, 2005, which was denied on August 19, 2005. Exh. F. Mr. Miller then filed a petition for writ of habeas corpus in the California Court of Appeal, Sixth Appellate District on September 16, 2005. That petition was denied on September 15, 2006. Exh. G. A timely petition for review was then filed in the California Supreme Court on September 25, 2006, resulting in the previously mentioned denial on December 13, 2006. Exh. H. These decisions fail to follow clearly established federal law, as articulated by the United States Supreme Court, and were based on rulings that were made upon a deficient and literally non-existent fact finding process. As such, the ruling by the state courts resulted in patently arbitrary, unreasonable and wrong findings when applied to the applicable principles of clearly established federal law, in violation of Fourteenth Amendment Due Process protections. Thus, this petition is cognizable under federal question jurisdiction, pursuant to 28 *U.S.C.* § 2254, and is timely filed under those same provisions, as only 364 days (as of 6/11/07) have run, which were not tolled by the timely filed state court petitions.[2]

### INTRODUCTION

This case arises out of the continued and repeated denial of parole to a state prison inmate, Emery Miller, convicted of first degree murder under the pre-1977 Indeterminate Sentence Law (ISL), who has spent *thirty-three (33)* years in prison despite what can only be described as a remarkable turnaround and the kind of rehabilitation espoused by the California

---

[2] Pursuant to *Carey v. Saffold*, 536 U.S. 214, 221-223 (2002) and *Nino v. Galaza*, 183 F.3d 1003, 1006 (9th Cir. 1999), all time is tolled from the filing of the first state habeas petition through the denial by the California Supreme Court.

Corrections system. Despite the fact that the crime occurred when Mr. Miller was a minor, barely seventeen (17) years of age, he has now been denied parole twenty (20) times. By all accounts, including those of the Corrections experts themselves, Mr. Miller has undergone a transformation and rebuilding of character from the 17-year-old who committed this offense, making him not only suitable, but deserving of parole. However, despite this dramatic transformation and in the face of Mr. Miller's fulfillment of all the conditions of his sentence, in addition to serving a sentence that is twice the term prescribed by the Board[3] for this offense, the Board has refused to set a release date, despite twenty (20) separate opportunities to do so.

Moreover, the Board, in finding Mr. Miller unsuitable for parole failed to acknowledge the substantial differences between juvenile and adult offenders, as articulated in by the U.S. Supreme Court in *Roper v. Simmons,* 543 U.S. 551, 125 S. Ct. 1183, at 1195-1196 (2005). Mr. Miller was barely seventeen (17) years old at the time of the offense, yet, the Board ignored that fact. As the *Roper* Court noted, "... *juvenile offenders cannot with reliability be classified among the worst offenders*...[due to their] lack of maturity and an underdeveloped sense of responsibility...[which] often result in impetuous and ill-considered actions and decisions." (*Id.,* emphasis added.) The *Roper* Court went on to state that "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure... the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. [Citation omitted]. *These differences render suspect any conclusion that a juvenile falls among the worst offenders*. The susceptibility of juveniles to immature and irresponsible behavior means '*their irresponsible conduct is not as morally reprehensible* as that of an adult. Their own vulnerability and comparative lack of control over their immediate surroundings mean *juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment*...[I]t is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that *a minor's character deficiencies will be reformed*.

---

[3] On January __, 2006, Mr. Miller was found suitanle by the Board, and his term set at 18 years, before the Governor reversed that findings. Exh. __. That panel assessed his post-commitment credits at __ years, giving Mr. Miller over 39 years of credits at this point. *Id.*

3

Indeed, '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.'" (*Id.*, emphasis added.) These rules apply forcefully here, to a seventeen (17) year old minor who was acting out as the result of unresolved anger over his brother having been killed by the police when he was just thirteen (13). This is precisely what the Central District concluded in *Rosenkrantz v. Marshall [Rosenkrantz VI]*, 444 F.Supp.2d 1063, at 1085 (C.D. Cal. 2006), where that Court applied the *Roper* principles to an 18 year old murder defendant.

In a virtually identical petition, the superior court denied Petitioner's application for habeas corpus relief in connection with his twentieth (20th) parole consideration hearing, on a single very narrow ground, ignoring Mr. Miller's youthfulness when the crime occurred, and the multiple due process arguments raised by petition. As that court articulated the sole basis for the ruling:

> "In this case there is some evidence supporting ***Commissioner*** Harmon's impression that Petitioner's anger management and impulse control abilities failed during the hearing. Whether or not it could be properly characterized as a 'melt down,' an ***inmate's antagonism towards a commissioner*** at the parole consideration hearing constitutes evidence of unsuitability." Exh. F, p. 545, 8/19/05 Order (emphasis added).

This ruling is patently unreasonable on several distinct grounds. First of all, this was not a "finding" by the Board, as only the Commissioner, here Susan Fisher, is permitted to recite the findings of the Panel. Of course, in reciting the actual basis for denying parole, she never made a finding that Mr. Miller exhibited "antagonism towards a commissioner at the parole consideration hearing" as the superior court somehow concluded from Harmon's comments. The protocol in a Board hearing is that a ***deputy*** commissioner, such as Deputy Commissioner Robert Harmon, does not recite the findings of the Board, but merely is merely invited by the Presiding Commissioner, here Ms. Fisher, to make "comments" to the inmate. These "comments" do not take on the dignity of findings to support a denial of parole. Secondly, even if Ms. Fisher had made a finding as to the alleged "demeanor" of Mr. Miller, it was merely described by deputy commissioner Harmon as "it [my question] upset you enough that you lost sight of what the question was that I asked you, and the question was never answered."[4] Exh. A,

---

[4] Even this characterization was wholly erroneous. What actually transpired was that ***the deputy commissioner became upset*** when it was pointed out to him that an administrative CDC 115 disciplinary is not "serious" for parole

4

p. 99.   Such a finding does not support any statutory or regulatory factor of unsuitability. Finally, even if viewed as a finding under a proper statutory or regulatory criterion, the colloquy on the record between Petitioner, his counsel and deputy commissioner Harmon do not factually support the finding, nor does the finding support a denial of parole.   Instead, it was clearly deputy commissioner Harmon that was demonstrating "antagonism" after asking a clearly improper question, having it properly objected to, and having the inmate answer in a forthright manner.[5]   In short, no matter how this point is viewed, this purported "evidence" does not establish that Mr. Miller is currently unreasonably dangerous, and that the decision of the superior court is both unreasonable and wrong.

### 2. Willis v. Kane

In *Willis v. Kane*, __ F.Supp.2d __, 2007 WL 1232060 (N.D. Cal. 2007), the petitioner had been convicted of second degree murder in 1985 and was sentenced to fifteen years to life. *Id.* at 1.   Willis killed his 19-month old daughter in 1983 when he hit her several times in the head and failed to obtain medical treatment when she exhibited signs of distress. *Id.*   Initially, he reported that his daughter had been kidnapped, but later confessed to the killing. *Id.*   At his 2003 parole suitability hearing, the Board concluded Willis was not suitable for parole relying primarily on his commitment offense and also stating he had not participated in sufficient self-help and therapy and did not have realistic parole plans. *Id.*   The court in *Willis* specifically addressed the most recent Ninth Circuit decisions addressing parole suitability hearings, *Biggs*, *Sass*, and *Irons II*. *Id.* pp. 3-4.   In doing so, it concluded that the Board can look at immutable circumstances, such as the commitment offense, but the value of those circumstances as a predictor of future dangerousness will diminish over time. *Id.* at p. 4.   The court also noted that exemplary institutional behavior and rehabilitation are also relevant to a determination of current dangerousness. *Id.*   Accordingly, the court stated, "*Superintendent v. Hill*'s standard might be

---

suitability purposes. Exh. A, pp. 37-38. Then, he became further irritated at Petitioner's counsel when an objection was made to a wholly inappropriate question, which would have required Petitioner to adopt its underlying assumption that he had not instituted any behavioral changes until September 27, 1996, when in fact the evidence is clear that he began a dramatic turnabout in 1990. *Id.* pp. 37, 40. At no time did Mr. Miller exhibit any "antagonism" or hostility of any kind towards Mr. Harmon. Instead, he was just unable to adopt the premise of the question, which assumed adverse behavior up until September 26, 1996, and an "epiphany" of sorts on the 27th, when in fact, the evidence clearly showed that the changes were in 1990, seven (7) years earlier, and that the reduction of the 115 by the staff to an administrative (non-serious) 115 was due to the fact that Mr. Miller accurately had permission to build the cabinet he was written up for. *Id.* pp. 37-41.

[5]   See ftnt 4, *supra.*

5

quite low, but it does require that the decision *not* be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision." *Id.*

In granting Willis' petition, the court concluded that none of the factors cited by the Board were supported by any evidence. *Id.* at 6. First, the court concluded that in light of the petitioner's favorable psychological reports and the absence of any mention of a need for further therapy or self-help, the Board's allegation that Willis needed further self-help programming and therapy was not supported by the evidence. *Id.* Second, the court concluded Willis' parole plans were realistic, as he planned to enter a transitional home or move to Florida with his parents. He also had several marketable skills and thus the record supported the inference that he would succeed if paroled. *Id.* Finally, the court concluded that the commitment offense did not provide any evidence that Willis was unsuitable. *Id.* at 9. In analyzing whether the commitment offense still provided evidence of unsuitability after numerous years, the court stated,

> "[t]he facts of that crime will be just as terrible 20 years from today as they are today and as they were 20 years ago. Notwithstanding the terrible nature of the crime, the critical question the BPH was supposed to decide at the parole suitability hearing was whether 'consideration of the public safety requires a more lengthy period of incarceration for this individual.' [Citation]. When the totality of circumstances are considered, Willis' 1983 crime did not provide sufficient evidence to find him unsuitable for parole in 2003. Willis' case is the kind of case *Biggs* and *Irons* cautioned about: the continued reliance on immutable events of the crime to deny parole for present dangerousness despite the candidate's exemplary behavior in prison, favorable current psychological reports, and the absence of any other violence or criminal record." *Id.*

Thus, the court concluded the Board's arbitrary reliance on the commitment offense after eighteen (18) years violated due process and the state court's decision was an unreasonable application of *Superintendent v. Hill. Id.* at 10. Here, in contrast to *Willis,* the commitment offense is far less egregious, with an adult victim, as opposed to a small child who is incapable of defending against the assault. Mr. Miller offense arose in the context of an altercation with an adult male, two persons more or less on equal footing. Willis, on the other hand, beat his helpless 19 month old daughter to death. But in both cases, due to the passage of time, the offense clearly no longer presents any evidence that Mr. Miller is a current and unreasonable risk to society, as Mr. Miller, like Willis, has established a lengthy pattern of positive programming in the last two (2) decades of his incarceration. Additionally, both Mr. Miller and Willis received positive psychological evaluations, with no indication that there was any need for

6

further self-help programming or therapy. As the court in *Willis* concluded, the Board's reliance on only the facts of the crime can make for an arbitrary decision. *Willis, supra*, at 4. The arbitrariness of the Governor's decision in this case is abundantly clear, as the non-crime findings relied on were not supported by any evidence, while the crime based findings suffer from the same deficiency noted in *Willis*. Thus, like *Willis*, the predictive value of the commitment offense no longer provides any evidence that Mr. Miller is a current and unreasonable threat to society, and as such, he is entitled to relief.

Petitioner does not herein challenge his underlying conviction. To the contrary, Mr. Miller takes full responsibility for his actions. Mr. Miller does, however, challenge the Board's determination that he is unsuitable for parole. By denying Mr. Miller parole for the *twentieth* time, the Board violated his constitutional right to due process. This denial, and the nineteen (19) before it, occurred in the face of a host of State experts, psychologists, correctional counselors, and supervisors, who have unanimously been supportive of Mr. Miller's release on parole for many years and show an utter failure of the parole system and a clear infringement upon Mr. Miller's due process rights. *Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003) [It is a violation of due process to continue to deny parole in the face of uncontradicted evidence of rehabilitation, where the inmate does not demonstrate a continuing danger.]; see also [*Scott II*], 133 Cal. App. 4th 573 (2005); Willis v. Kane, __F.3d___[2007WL123060] (N.D. Cal. 2007); *Sanchez v. Kane*, 444 F.Supp.2d 1049 (C.D. Cal. 2006); *Rosenkrantz v. Marshall* [*Rosenkrantz VI*][6], 444 F.Supp.2d 1063 (C.D. Cal. 2006); *Martin v. Marshall*, 431 F.Supp.2d 1038 (N.D. Cal. 2006); *In re Lee*, 143 Cal.App.4th 1400 (2006). *In re Elkins*, 144 Cal.App.4th 475 (2006). As in the *Biggs* case, Petitioner's commitment offense itself was very serious, wherein what was meant to be a beating resulted in the death of the victim. However, as the Court in *Biggs* pointed out, the continued use of immutable factors (e.g. the commitment offense itself and pre-incarceration factors), to deny parole, without real evidence of current dangerousness, violates due process.

Furthermore, the Board violated Mr. Miller's due process rights by relying on unconstitutionally vague terms in order to deny parole. As presented in *Rosenkrantz V*, "the

---

[6]   The *Rosenkrantz* case has resulted in six decisions. *People v. Rosenkrantz* (1988) 198 Cal.App.3d 1187 (*Rosenkrantz I*), *In re Rosenkrantz* (2000) 80 Cal.App.4th 409, (*Rosenkrantz II*), *Davis v. Superior Court* [*Rosenkrantz*] (Feb. 22, 2001, B146421) [non pub. opn.] (*Rosenkrantz III*), *In re Rosenkrantz*, formerly published at (2002) 95 Cal.App.4th 358 (*Rosenkrantz IV*), *In re Rosenkrantz* (2002) 29 Cal.4th 616 (*Rosenkrantz V*), and

7

nature of the prisoner's offense, alone, *can* constitute a sufficient basis for denying parole." *Rosenkrantz V*, *supra*, 29 Cal.4[th] at 682 (emphasis added). The *Rosenkrantz V* decision employed conditional language that the offense can constitute such a basis, if the crime could reasonably be considered *more* aggravated or violent than the minimum necessary to sustain a conviction for that offense. *Id.* at 683 (emphasis added). Although the *Rosenkrantz V* language is itself arguably unconstitutionally vague, the California Supreme Court, in that decision, did state a clear directive that sole reliance on the commitment offense will violate the prisoners' due process rights pursuant to *Penal Code* § 3041(a) in situations where the offense "could [not] be considered *more* aggravated or violent than the minimum necessary to sustain a conviction for that offense." *Rosenkrantz V*, 29 Cal.4[th] at 683.

However, the subsequent *Dannenberg* decision, rendered by the California Supreme Court, further muddied the waters by changing the standard set forth in *Rosenkrantz V*, allowing the Board to deny parole based on the commitment offense if the inmate's crime was "more than minimally necessary to convict him of the offense for which he is confined." *In re Dannenberg*, *supra*, 34 Cal.4[th] at1095. As noted by the dissent in *Dannenberg*, this standard is *completely* unreviewable. *Id.* at 1102 (emphasis added). What is "more than minimally necessary" is incapable of definition, since there is no ability to quantify the evidence needed to establish the elements of the crime of murder. The result is a definition, or standard, that like the Greek god Proteus, constantly changes shapes, is never consistent and is incapable of being defined or pinned down. What may be callous or heinous under that standard to one Board member may not be such to another. As articulated in *Dannenberg*, every murder could fit into the category of "more than minimally necessary to convict" by virtue of the fact that the application is so arbitrary and depends on the subjective and personal opinions of the Board members. As such, the Board has fully exploited and abused this carte blanche language to repeatedly deny parole based **solely** on the nature of the commitment offense, by deeming it exceptionally "heinous, atrocious, cruel, or dispassionate." As will be seen, this has been done to justify multiple denials of parole to Mr. Miller, without any evidence supporting such findings.

Although Mr. Miller did accumulate a number of rules violations throughout the first years of his incarceration, he has now been violence free for twenty nine (29) years, and

---

*Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F.Supp.2d 1063 (*Rosenkrantz VI*).

8

Corrections staff who have evaluated him since 1990 have unanimously found him to be a "changed" man. Mr. Miller's growth and maturity the past seventeen (17) years of his incarceration have been every bit a of 180° turnabout in contrast to his first few years. Mr. Miller has undertaken every available step to improve his life, pay his debt to society, and prepare himself for eventual release. While incarcerated, Mr. Miller earned his GED and has furthered his marketable skills by completing vocational trades, and becoming skilled as a carpenter. He also furthered his skills over the years by performing concrete work, tile and framing, mill and cabinet, electrical, and general construction work. Mr. Miller has participated in significant self-help programming, including the IMPACT Program (teaching awareness of the impact of crime on victims), Ross Marsh Fellowship, Vital Issues Project, Square One Narcotics Anonymous, Breaking Barriers Program, Prevailers Fellowship, V.O.L.T. (Victims/Offenders Learning Together) Program, Project Last Chance, and long-time attendance in Alcoholics Anonymous and Narcotics Anonymous.

Additionally, CDC's own psychologists have consistently given Mr. Miller a clean bill of mental health for the past seventeen (17) years. As far back as 1990, Dr. Ernst concluded:

> "...*Subject does not appear to pose any threat to society. Violence potential is estimated to be well below average.* Insight and judgment are good and are improving. Control of emotions is good, and especially his ability to put his feelings into words. ... *Retention in CDC would be based on factors other than psychiatric.*" Exh. B, pp. 255-256 (emphasis added).

In short, Mr. Miller has long proven himself worthy of release pursuant to *Penal Code* §3041. However, despite the absence of any evidence showing Mr. Miller to pose any danger of violence to the community if released, the Governor denied Mr. Miller a parole date for the *twentieth* time, relying solely on the immutable facts of the commitment offense. *In re Dannenberg, supra,* 34 Cal.4th at 1084; see also *Biggs v. Terhune, supra,* 334 F.3d at 915. The latest denial of parole, like all of those since 1990, was based on the immutable factors of the offense itself and Mr. Miller's pre-incarceration conduct. This kind of denial of liberty is in clear violation of the federal due process principles enunciated in *Biggs* and the subsequent decisions in *Scott II, Irons, Sanchez, Rosenkrantz VI, Martin, Lee,* and *Elkins. Biggs, supra,* 334 F.3d at p. 915; see also *Scott II, supra,* 133 Cal. App. 4th 573; *Sanchez, supra,* 444 F.Supp.2d 1049; *Rosenkrantz VI, supra,* 444 F.Supp.2d 1063; *Martin, supra,* 431 F.Supp.2d 1038; *Lee, supra,* 143

9

Cal.App.4[th] 1400; and *Elkins, supra*, 144 Cal.App.4[th] 475.   The result is that Mr. Miller is not being afforded the due process required by *Penal Code* §3041, which requires that a parole date "shall" be set in the case of an offender such as Mr. Miller. (See also, *California Code of Regulations*, Title 15 [hereafter "*Cal. Code Regs.*, tit. 15"] §2281(c).) This denial of due process requires the intervention of this court by way of the issuance of a Writ of Habeas Corpus.

### *STATEMENT OF THE CASE*

#### I.

Petitioner Emery Miller is currently confined at California Correctional Training Facility and State Prison in Soledad, California, part of the State of California Department of Corrections & Rehabilitation (CDCH), in the custody of Warden Ben Curry, pursuant to the judgment of the Superior Court for the County of Santa Clara, Case. No. 58303.  Real Party in Interest Governor Arnold Schwarzenegger is charged with the duty under *Penal Code* §3041.2 to review the decisions of the Board of Prison Terms, whether said decision is to affirm, modify or reverse the Board's parole decision.  The Governor is the party that has unlawfully failed to comply with *Penal Code* §§3041 and 3041.2 to allow Petitioner's release on parole, and thus his term has not been fixed and he has not been release in the manner prescribed by law.  *Penal Code* §3041, *Cal. Code Regs.* tit. 15. §§2400 et seq.; *In re Ramirez*, 94 Cal.App.4th 549 (2001); *McQuillion I*, 306 F.3d 895 (9th Cir. 2002).

#### II.

Petitioner was sentenced on September 3, 1975 for a murder occurring on June 9, 1974. Exh. B, p. 486.  He was officially received into the Department of Corrections on May September 11, 1975 with fifteen (15) months of pre-prison credits.  Thus, Mr. Miller has thirty-one (31) years in CDC, fifteen (15) months of pre-prison credits, and is entitled to over ten (10) years [31 x 4 months] of post commitment credits under *Cal. Code Regs.*, tit. 15 §2290, which totals more than forty three (43) years.  Under the Matrix (*Cal. Code Regs.*, tit. 15 §2282(b)), victim category III and circumstance category C apply, making the uniform term 14-16-18 years.[7]

---

[7] When the Board found Mr. Miller suiotable in January of 2006, it set his term at 18 years, using Categories III (c).

10

Thus, Mr. Miller has now served an effective term that is *more than twenty three (23) years* over the term deemed appropriate by the Board's own regulations for a crime committed in 1974. Still, Mr. Miller does not even have a future parole date set.

### STATEMENT OF FACTS

### III.

Petitioner has prepared a detailed Statement of Facts in the accompanying Memorandum of Points & Authorities, and the same is incorporated herein by reference as though set forth in full. That statement outlines the circumstances of the commitment offense, provides a detailed chronology of Mr. Miller's substantial accomplishments while incarcerated, his positive work record, his completion of numerous self-help programs, his accomplishment of avoiding any serious disciplinary infractions for the past seventeen (17) years and remaining free from any violent disciplinary infractions for twenty-eight (28) years, and highly supportive psychiatric evaluations. In addition, the statement sets out the details of the initial and subsequent parole hearings, going through the materials and information presented. The reader's attention is directed to the attached Points & Authorities for a full understanding of the background of this matter.

### IV.

On the evening of June 8, 1974, and early morning hours of June 9, 1974, Mr. Miller attended a party in San Jose. At approximately 2:00 a.m., Mr. Miller and a friend, Larry Hildreth, decided to leave. They were sitting in the car in front of the residence when they heard a loud argument between a neighbor, victim Raymond McVea, and another of Mr. Miller's friends, Lawrence Rosette, in the front yard of a nearby house. Mr. McVea was shouting that he was going to call the police to complain of all the noise coming from the party, in addition to making racist remarks.[8] Exh. A, p. 260. Mr. Miller exited the car, and he and his codefendant Mr. Rosette, walked up to Mr. McVea and told him that he was not going to call the police, and struck him, knocking the victim to the ground. Mr. Miller and Mr. Rosette proceeded to beat and kick Mr. McVea. Mr. Hildreth stood nearby and observed the beating and then returned to the car, where he was later joined by Mr. Miller and they both drove off. Exh. B, p. 459. Mr. Miller

---

[8]  It must be noted that when Mr. Miller was thirteen (13), his older brother was shot and killed by the police. Mr. Miller, therefore, has a well-founded fear of the police, in addition to vented up anger from failing to deal with the trauma he suffered as a result of the loss, and while he went to unreasonable lengths to prevent Mr. McVea from calling them, by an objective standard, considered in light of his subjective fears, his overreaction becomes more

11

never intended to kill Mr. McVea and was unaware of the extent of the extent of Mr. McVea's injuries when he left. Mr. McVea passed away later that morning as a result of the injuries sustained in the beating. Mr. Miller was convicted as a result of the testimony provided by codefendant Mr. Rosette and witness, Mr. Hildreth, who had initially lied about his involvement and the facts of the attack. *Id.*

## V.

At the time of the offense, Petitioner had just turned seventeen (17) years old, was immature, and ill-equipped to handle his emotions when faced with Mr. McVea's threat, anger and racist remarks. He is extremely remorseful for his act, and as noted by counselors, carries appropriate guilt around with him daily. Exh. A, p. 126. After a rocky first few years of incarceration, Mr. Miller has shown total dedication to self-improvement and therapy, and has put intense effort into rehabilitation, treatment, and control of past conditions that contributed to his commitment offense, namely the inappropriate handling of his emotions under stress.

## VI.

Mr. Miller does *not* currently pose an unreasonable risk of danger to society. His classification score has dropped steadily over his entire history of incarceration and is now at the lowest classification score possible.[9] Exh. A, p. 120. Mr. Miller has been free of any serious disciplines for seventeen (17) years, and has been free of violence for nine eight (29) years. Mr. Miller presented letters of support to the Board from family and friends, all establishing that he has matured significantly and is a changed man who is ready to become a contributing member of society. Exh. D, pp. 538-543. These letters also contained offers of employment, housing, and financial and emotional support. Mr. Miller has furthered his marketable skills by completing vocational trades and becoming skilled as a carpenter and in performing concrete work, tile and

---

understandable. See generally, Exh. B, p, 218.

[9] The CDC's "classification score" is a measure of the security risk attributed to a prisoner by the CDC. Every prisoner is received into the CDC with a score determined by offense and certain other characteristics and then is either raised or lowered depending upon the prisoner's incarceration history. Previously, the lowest and most favorable classification was zero (0). The highest possible drop of points in any given one year between classification hearings is eight (8) points. Now, all lifers have been assessed a base score of 19 points, which is the most favorable possible score. Mr. Miller was at zero (0) before the mandatory minimum score was raised to nineteen (19).

framing, mill and cabinet, electrical, and general construction work. His parole plans were clearly solid and realistic.

## VII.

While there is no evidence that Mr. Miller is in any way dangerously unpredictable, there is a wealth of evidence attesting to the fact that he has very much matured in the last thirty-three (33) years, and was suitable for parole at his 2004 parole consideration hearing. See generally, Exh. A, pp. 1-100.[10] In light of the record, the Board's action in refusing to even set a future parole date in the face of all the contrary evidence is unjustified in violation of the statutes conferring its authority, and a violation of due process. The Board has abdicated its duty to consider the facts of the case in deference to a "no-parole" policy, thus violating the due process clause of the Fourteenth Amendment, has violated the statutory mandates of the Legislature, and abuses its power by violating the liberty interest in parole created by statute. Thus a review by the Judiciary and issuance of a writ of habeas corpus is the only available remedy.

## VIII.

All of the evidence before the Board, including the psychiatric reports of the state's own experts, establish that Mr. Miller is truly remorseful about the commitment offense, and is psychologically ready for parole. Exh. A, pp. 1-100. The post-conviction progress reports also illustrate Mr. Miller's exemplary progress and development throughout the entirety of his incarceration, and clearly show his suitability for parole. Exh. A, pp. 120-122;125-126;133-134;141;148;155. Mr. Miller has used his time in prison productively and continued to improve himself educationally while incarcerated. He has completed his GED, in addition to completing a Principles of Real Estate course. *Id.* at 143; 154. He has also been focusing on his skills in carpentry, where he receives exceptional reports. *Id.* at 124. Additionally, he has taken advantage of many self-help programs available to him while incarcerated, including recently completing the thirteen (13) week Impact program, a self-help group that teaches inmates how crime affects the victims. *Id.* at 120. He has continued to be dedicated to NA. *Id.* Mr. Miller has also participated in the Ross Marsh Fellowship, Vital Issues Project, Square One (NA), the Breaking Barriers Program, Prevailers Fellowship, V.O.L.T. (Victims/Offenders Learning Together) Program and Project Last

---

[10] In fact, at his January 2006 hearing, the Board found him suitable for parole, but Governor Schwarzenegger reversed that finding in July of 2007. That reversal is currently being challenged in the Santa Clara County Superior Court. See Exh. ____.

13

Chance. His evaluating psychologist in January 2003, Dr. William Gamard, stated that "[a]lthough he had criminal behaviors during his teenage years which culminated in the present offense, which occurred soon after he turned 17, this inmate has fully matured in an impressive way since then. He is extremely stable, has solid work skills which he enjoys, and takes pride in, and he has exhibited no violent behaviors for over 14 years." *Id.* at 222. Dr. Gamard concluded that if released into the community, Mr. Miller's violence potential is estimated to be no higher than the average citizen in the community. *Id.*

## IX.

The parole hearing at issue was on June 27, 2004, and the denial was primarily based on the commitment offense.[11] Despite clear and uncontradicted evidence of suitability, the Board nevertheless found that he would pose "an unreasonable risk of danger to society or threat to public safety if released from prison." To support its decision, the Board Panel stated: 1) "[The offense] was incredibly cruel and callous and was certainly carried out in a manner that clearly shows a lack of regard for the life and suffering of another;" 2) "The prisoner has an escalating pattern of criminal conduct beginning back in 1971 up until the time of the commitment offense;" 3) "[Petitioner] has not sufficiently participated in beneficial self-help;" and 4) his disciplines. Exh. A, p. 97.

These "findings" violate the rules announced in *Apprendi*, *Blakely*, and *Cunningham* as they were not made by the trier of fact, at the time of conviction. However, even if the Board was allowed to make factual finding regarding the crime, the findings it did make were factually unsupported. The first finding merely consists of the elements that caused his particular offense to be found as a first degree murder, rather then second degree, and therefore cannot make the offense "particularly egregious" within the meaning of *Ramirez, In re Rosenkrantz* [hereafter "*Rosenkrantz V*"], 26 Cal.4th 616, 658 (2002), *Elkins, supre, Lee, supra, Rosenkrantz VI, supra,* and *Willis, supra.* Furthermore, the repeated reliance by the Board on the commitment offense for the 20th time violates due process under the rule of *Biggs v. Terhune, supra,* 334 F.3d at 916-917. Second, although Mr. Miller did in fact have prior juvenile adjudications between the ages of thirteen and fifteen, he has since made a remarkable turnaround, which has been attested to by multiple CDC

---

[11] Although the Board announced this as the basis of its decision, the Superior Court for some reason went off on a tangent and upheld the Boar's decision based on an off the cuff, and factually erroneous, statement by the deputy commissioner, which was not adopted by, the commissioner as a basis for the parole denial, regarding Mr. Miller's handling of certain questions at the hearing.

14

employees. The third finding is particularly disturbing in light of Mr. Miller's 2003 psychological evaluation, which found that Mr. Miller is "extremely stable," and recommended no medical health treatment. Exh. B, p. 222. The fourth claim is also unfounded in that Mr. Miller has conducted himself in an exemplary manner for the last seventeen (17) years. The result of that decision is that Mr. Miller has now served a term, with credits, that is more than twenty-five (25) years beyond the maximum amount of time that the matrix has established for his subject offense and his term has clearly become disproportionate to his culpability.[12]

## X.

On May 27, 2005, Petitioner filed a petition for writ of habeas corpus in the Superior Court for the County of Santa Clara. On August 18, 2005, the court denied the petition, finding the Board's decision proper in light of *In re Dannenberg*, 34 Cal.4th 1061. That decision upheld the Board decision based on a finding that there was "some evidence supporting Commissioner Harmon's impression that Petitioner's anger management and impulse control abilities failed during the hearing." Exh. F, p. 545. However, was not an actual finding of the Board, and was not recited as a basis for the denial of parole. Both the Court of Appeal and California Supreme Court then issued summary denials. It is well settled that California *Penal Code* §3041 gives prisoners a "presumption" of being granted parole, absent their crime being particularly egregious. *McQuillion I, supra*, 306 F.3d 895, 901 ("The scheme 'creates a presumption that parole release will be granted."). This protected liberty interest in the presumption of parole is founded in long-settled United States Supreme Court precedent. See *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1,7 (1979), and *Board of Pardons v. Allen*, 482 U.S. 369, 376-78 (1987). Furthermore, repeated denial of parole, here twenty (20) denial, in the face of proof of rehabilitation, can offend due process, as, the probative value of the crime based evidence and other immutable factors declines over time. *Willis, supra*, at [discussing *Biggs, Irons II, and*

---

[12] The *Cal. Code Regs.*, tit. 15 §2403(b) provides a current matrix term of 29-30-31 years, less post-conviction credits for Matrix III-C (No Prior Relationship with the Victim and Severe Trauma). Because Mr. Miller was convicted prior to the July 1, 1977, enactment of the Determinate Sentence Law (DSL), the Constitution's ex post facto protections guarantee him a term consistent with whichever term is more favorable to him as defined in *Cal. Code Regs.*, tit. 15 §§2282(b) or 2403(b). See *In re Stanworth*, 33 Cal.3d 176 (1982). Under §2282(b), the matrix for pre-1977 murders sets the proportional term for this offense at 14-16-18, which is even less than the current matrix, and thus, Petitioner is entitled to rely on that term. Note that this was the Matrix used by the 2006 Board that later found Mr. Miller suitable for parole. See Exh. K. Despite this, he has now served nearly two and one half times the applicable matrix, and with credits, exceeds the highest terms on the current matrix by then (10) years.

15

*Sass*]. Finally, a juvenile offender such as Mr. Miller cannot be treated on par with their adult counterparts. *Roper, supra*. For each of these reasons, the Superior Court's last reasoned decision, and thus that of the Board, cannot stand.

## LEGAL CLAIMS

### DENIAL OF DUE PROCESS
### XI.

"The touchstone of due process is protection of the individual against arbitrary action of the government." *Wolff v. McDonnell, supra*, 415 U.S. 558. Absent a factually supported showing that he currently represents an unreasonable risk of danger to society, after a full and proper consideration of all relevant factors set forth in the parole statutes and regulations, there is no basis upon which parole can be denied. *Greenholtz v. Nebraska Penal Inmates, supra*, 442 U.S. at 12; *Board of Pardons v. Allen*, 482 U.S. at 376-378; *McQuillion I, supra*, 306 F.3d 895, 901; *In re Ramirez, supra*, 94 Cal.App.4th 549, 569; *Sanchez, supra*, 444 F.Supp.2d 1049; *Rosenkrantz VI, supra*, 444 F. Supp.2d 1063; *Martin, supra*, 431 F.Supp.2d 1038; *Elkins, supra*, 144 Cal.App.4th 475; and *Lee, supra*, 143 Cal.App.4th 1400 *Scott II, supra*, 133 Cal.App.4th at 597-595; *Cal. Pen. Code* §3041.[13] That was precisely the situation with Mr. Miller in this case. The Board's actions, and the subsequent failures to act by the California courts, have arbitrarily denied him these rights in contravention of due process of law.

### XII.

Mr. Miller has submitted extensive points and authorities in support of this petition, which detail the legal basis upon which relief is sought, and the same is incorporated herein by reference as though set forth in full.

### XIII.

---

[13] Even if the decision in *Dannenberg, supra*, 34 Cal.4th 1061 is applicable, this expectation is not lessened nor removed by the ruling therein. Regardless of the inadequacies of the standard enunciated by that court, at a minimum, the *Dannenberg* Court held that the Board must point to factors **beyond** the minimum elements of the crime before denying parole, and must be supported by competent evidence. *Id.* at p. 1084. Respondent filed petitions for review in both *Scott II* and *Elkins*, and also filed a request for depublication of *Scott II* and for a stay of the decision in *Elkins* to preclude the release of Elkins. All of these requests were denied by the California Supreme Court in Case #S147840 (*Elkins*), and Case #138430 (*Scott II*), obviously showing the Court's acceptance of the rules announced in those cases. Here, the Board has not and cannot point to factors beyond the minimum elements of first degree murder that can justify denying Mr. Miller a parole date after thirty-three (33) years.

16

*Penal Code* §3041 creates a presumption of parole suitability, absent a factual showing that the inmate currently presents an unreasonable risk of danger of committing a violent act. *McQuillion I, supra,* 306 F.3d at 902 ["The scheme 'creates a presumption that parole release will be granted' unless the statutorily defined determinations are made"]; *Cal. Code Regs.,* tit. 15 § 2281(a). Parole decisions by the Board or Governor must be rendered within the limitations set forth in applicable statutes and guidelines in the *Penal Code* and Title 15, *California Code of Regulations,* including application of the regulatory factors of suitability and unsuitability, and the statutory requirement that terms must be set with uniformity and proportionality. On these issues, under the California Supreme Court's decisions in *Rosenkrantz V* and *Dannenberg,* the state courts unreasonably defer to the Board's unilateral and violative conversion of Petitioner's parole eligible term to a life sentence without parole, by simply arbitrarily finding that the evidence is "more than minimally necessary to convict," even in the face of the Board's crime based findings being without factual support in the record. *Dannenberg, supra,* 34 Cal.4th at 1095; Exh. H, p. 126. As noted by the dissent, this standard is "meaningless" (*Dannenberg, supra,* 34 Cal.4th at 1103), and as applied to a parole decision-making process that refuses to grant parole to deserving inmates like Mr. Miller, and which provides a wholly unfair and arbitrary procedure, it simply serves to facilitate a system that routinely violates the due process rights of inmates.

### XIV.

Furthermore, the Board's criteria for establishing suitability under *Cal. Code Regs.,* tit.15, § 2281(d) include that the inmate: "(1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered women syndrome; (6) lacks any significant history of violent crimes; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release." With the exception of the obviously inapplicable criteria relating to battered woman syndrome, Mr. Miller is indisputably suitable under each of these criteria. No evidence was presented at the hearing to support a contrary finding under any of these criteria.

## XV.

In the present case, Mr. Miller had a legitimate expectation that the government would set a parole release date before his eventual release date had passed, fixing the length of his sentence in accordance with his minimum term and the guidelines of uniform terms based on the circumstances of his conviction for first degree murder. *McQuillion I, supra*, 306 F.3d 895, 930, *Penal Code* §3041, *Cal. Code Regs.*, tit.15, §2281 et seq., and *In re Ramirez, supra*, 94 Cal.App.4th at p. 549.    In Mr. Miller's case, the evidence indisputably established suitability under *Cal. Code Regs.*, tit.15, § 2281(d), based upon his youthfulness at the time of the crime (see *Roper, supra*),the positive evidence of his programming, the long passage of time since the crime and juvenile priors occurred, and the circumstances surrounding his commitment offense. Here, the Board's finding of unsuitability on a repeated and long sending basis fails to fall within the limits imposed by applicable law, thereby denying due process.  In short, in its decision, the Board has acted unlawfully, arbitrarily and capriciously and without supporting evidence, and the state courts misapplied clearly established federal law and made findings that are both unreasonable and wrong in failing to grant habeas corpus relief.  No evidence exists to show that Mr. Miller is currently dangerous and thus factually unsuitable for parole, within the meaning of *Penal Code* § 3041 and *Cal. Code Regs.*, tit.15, 2281(c).  To the contrary, as discussed *supra*, he is suitable under each of the relevant criteria under *Cal. Code Regs.*, tit.15, § 2281(d)[14].  Thus, the denial of parole amounts to a violation of Mr. Miller's liberty interest under the due process clause.  No reasonable reviewing court could have properly concluded that the Board's decision was lawful.  In short, the fact finding and review processes of the Board and California courts were wholly inadequate, and therefore, there is no presumption of correctness that attaches to any finding by the Board or those courts.

## XVI.

The Board has a duty to make all recommendations "sufficiently clear" to inform Mr. Miller what conduct will result in a grant of parole.  *U.S v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002) [citing *Graynet v. City of Rockford*, 408 U.S. 104, 108-109 (1972).][15]  Thus, the onus

---

[14] In fact, at his 2006 hearing, Mr. Miller was found suitable under each of these criteria, before the Governor reversed the decision based on the crime.

[15] A prisoner's due process rights are violated if parole conditions are not made "sufficiently clear" so as to inform him of what conduct will result in his being returned to prison.  Likewise, the Board of Prison Terms has a duty to

18

is on the Board to clearly and specifically state what conduct will warrant a finding of suitability. It follows that there is only one way to interpret the recommendations given to Mr. Miller at each of the twenty (20) hearings. These recommendations constitute the Board's "clear instructions" as to what Mr. Miller must do to be found suitable.   As such, it is interesting to note that at the 2004 hearing, the Board gave a list of recommendations for the next hearing to which Mr. Miller asked, "are you telling me that if I do these things...that I'm suitable." Exh. A, p. 100. The commissioner replied, "I can't tell you that." *Id.* The Board's response is a clear indication that their "recommendations" amount to mere hoops for the inmate to jump through, and that they lack they lack the required clarity and sincerity. The Board effectively says the *exact same* thing every year and provides the *exact same* recommendation with full knowledge that Mr. Miller has complied with *every single* recommendation in the fifteen (15) years proceeding the 2004 hearing.  The Board's own response makes it clear that either the Board's recommendations are nothing more than a ruse, or they are in violation of the "sufficiently clear" mandate.

## XVII.

The unavoidable logical consequence of the Board's failure to grant a parole date is an impermissible conversion of Mr. Miller's parole-eligible sentence into a sentence of life without the possibility of parole, subject only to an arbitrary potential that a subsequent Board Panel may conclude that the crime is not a bar to a finding of suitability.  Furthermore, the Executive Branch's position is also in violation of the statutes and regulations setting out the factors that the Governor and the Board must consider in determining parole suitability. *Penal Code* § 3041, *et seq.*; *Cal. Code Regs.*, tit.15, §2400, et seq.  If an inmate "continue[s] to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole." *Biggs v. Terhune, supra*, 334 F.3d at p. 910; see also *Rosenkrantz VI, supra*, 444 F.Supp.2d 1063; *Scott II, supra*, 133 Cal.App.4th at 594-595. As noted by the court in *Scott II*,

> "The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his "Previous Record of Violence"). Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair (citation omitted), and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due

---

make recommendations for parole eligibility "sufficiently clear" so as to inform the inmate of conduct that will warrant a finding of suitability.  See *U.S. v. Guagliardo, supra*, 278 F.3d 868.

19

process violation." (Citation omitted). The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable pubic safety risk if released from prison. Yet the predictive value of the commitment offense may be very questionable after a long period of time. (Citation omitted) Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny."

See also *Willis, supra*; *Sanchez, supra*, 444 F.Supp.2d 1049; *Rosenkrantz VI, supra*, 444 F. Supp.2d 1063; *Martin, supra*, 431 F.Supp.2d 1038; *Elkins, supra*, 144 Cal.App.4th 475; and *Lee, supra*, 143 Cal.App.4th 1400. Here, the facts of the commitment offense, although admittedly serious, are insufficient to justify the findings of unsuitability, and the failure to set a parole release date, particularly in the repeat basis that has occurred here, violates due process within the meaning of *Biggs, Scott II, Willis, Sanchez, Rosenkrantz VI, Martin, Elkins*, and *Lee*. Repeated reliance on the commitment offense as a reason to deny parole and the California courts' upholding of the Board's action, in the face of crime based findings that were factually unsupported, is both unreasonable and wrong, constituting a clear violation of Mr. Miller's liberty interest in parole.

## XVIII.

The Board's denial of a parole date in 2004 was part of an unlawful pattern and practice of the Board to arbitrarily deny parole to virtually all inmates convicted of life top offenses, irrespective of their accomplishments and efforts at rehabilitation in the prison. The former Chief Executive of this state, then Governor Gray Davis, had explicitly declared the policy of the executive branch of government that those inmates serving life sentences should not be paroled.

> "'They must not have been listening when I was campaigning,' Davis said. 'If you take someone else's life, forget it. I just think people dismiss what I said in the campaign as either political hyperbole or something that I would back away from . . .We are doing exactly what we said we were going to do'." Exh. I, pp. 442-443.

This practice predated Davis' tenure, and has continued during the term of the current Governor, real party in interest, Arnold Schwarzenegger. Former Board Commissioner Al Leddy, and others, testified at a Joint Legislative Committee on Prison Construction and Operations on April 29, 1999.[16] The subject of that hearing was parole, public safety and proportionality in the

---

[16] The transcript is lengthy, and its content will not likely be disputed herein. Therefore, it was not included.

20

parole process. Numerous individuals testified at the legislative subcommittee hearing including former Board Commissioner Leddy, former United States Senator Alan Cranston, former California Supreme Court Justice Cruz Reynoso, and former Special Assistant to the U.S. Commission on Civil Rights Thomas Grey, along with a variety of attorneys and related professionals. They discussed the numerous instances of unreasonable and unlawful refusals by the Board to grant parole. Each noted numerous instances where the Board had unreasonably refused parole, or had used multiple rescission hearings in order to take a set parole date away from an otherwise deserving inmate. These facts show that the parole process is unfair, arbitrary and capricious, and should not be afforded the protection of any presumption of correctness, in the proceedings in this Court. Mr. Leddy also testified in a Marin County Superior Court evidentiary hearing in the case of *In re John Dannenberg*, Case #SC112688A.[17] Mr. Leddy testified to the existence of an unwritten policy started by Governor Wilson, and "followed rigorously" by Governor Davis. The policy actually started to form with Governor Deukmejian, when paroles went down to 4 or 5 percent, then was solidified by the following chief executives. Mr. Leddy acknowledged that the Board uses the preprinted BPT 1000a form to recite purported justifications for parole, and that rather than tailoring them to the individual inmate, simply read them off verbatim, even in situations where they do not apply.

**XIX.**

Petitioner has no other plain, speedy or adequate remedy in the ordinary course of the law. This petition is addressed to this Court's original habeas corpus jurisdiction because the issues raised are of federal constitutional dimension, questioning the legality of the Petitioner's confinement, where administrative remedies are not practical and have directly failed to provide the necessary relief. There are no longer any applicable administrative remedies. As stated *supra*, both the intrinsic and extrinsic review processes, as conducted in the Board proceedings and subsequently applied in the state courts, are flawed and have resulted in violations of clearly established United States Supreme Court law. Petitioner previously filed a petition in the Santa Clara County Superior Court challenging the same denial of parole, and that petition was denied. A true and accurate copy of the order denying the Superior Court petition is attached hereto as Exhibit

---

However, should it become an issue, Petitioner can provide it upon request.

[17] The transcripts of that hearing are available and can be submitted supplementally should the Court desire.

F. Petitioner then filed in the Sixth District Court of Appeal and the petition was summarily denied. A true and accurate copy of the summary denial by the court of appeal is attached hereto as Exhibit G. A timely petition for review was filed in the California Supreme Court, and was summarily denied on December 13, 2006.    A true and accurate copy of the denial from the California Supreme Court is attached hereto as Exhibit H. Thus, this petition is timely under the A.E.D.P.A. statute of limitations, as only 364 (as of 6/11/07) days ran following the December 13, 2006 denial, and all prior time was tolled by Petitioner having vigorously pursued his state court remedies, without any relevant breaks.[18] 28 *U.S.C.* § 2254. Thus, this matter is ripe for determination by this Court.

***REQUEST FOR EVIDENTIARY HEARING***

### XX.

Here, an evidentiary hearing would be appropriate to resolve the question of whether the Board is applying the regulatory terms in a manner that is unconstitutionally vague. A simple test can be done to illustrate the vagueness of the regulations as they are currently being applied, as well as the existence of the "no parole" policy. This Court can order respondent to produce the decisions by the parole Board during the ninety (90) days before and after Mr. Dannenberg's hearing, along with the Governor's decisions regarding any case where parole was granted by the Board (or en banc decision or rulings by the Decision Review Unit that changed or modified the decision), and as to any inmate that was actually released, any prior decisions of the Board denying parole as to that inmate. Petitioner anticipates that this evidence would show that in 100% of all murder cases, the crime has been found to be "especially heinous, atrocious, or cruel" at some point, so that even if the inmate is later actually paroled, his or her crime was at least once found to be within the "public safety" exception of *Penal Code* §3041(b). Alternatively, the Board can be directed to produce any decision in a murder case within the last ten (10) years where the inmate was found suitable at his or her initial hearing, and actually released without ever being found unsuitable or having the decision reversed by Decision Review, en banc hearing or Governor's review. Again, it is anticipated that there would be no such decision in existence. These facts would show precisely what the California Supreme Court was talking about when it cautioned that the exception cannot be interpreted in a manner so as to

22

"swallow the rule" that parole dates "shall normally" be granted, since there would be no case that has never been found to fit in the exception. *Rosenkrantz V, supra,* 29 Cal.4[th] at 683. Thus, as applied, the phrase would be violative of federal due process, in that it can fit any crime, and has lost the ability to distinguish crimes that truly are particularly egregious.[19]

*SUPPORTING EXHIBITS*

## XI.

Petitioner has concurrently lodged an appendix with this Court containing the documents supporting this petition and the same are incorporated herein by reference as though set forth in full. The Appendix contains a complete record of the Board proceedings at issue herein.

*PRAYER*

Wherefore, Petitioner requests that this Court:

1.    Issue a writ of habeas corpus or order to show cause to the respondent, Ben Curry, acting warden of the Correctional Training Facility at Soledad, the Board of Parole Hearings, and the Governor to inquire into the legality of the Petitioner's incarceration, both actual and constructive;

2.    Order the immediate discharge of the Petitioner from actual custody or the constructive custody of parole, or alternatively, order the Board to hold a new parole hearing within forty five (45) days, and if no new information is presented that establishes that Petitioner poses a present threat of future violence, to find Petitioner suitable for parole and set a release date;

3.    Conduct an evidentiary hearing to resolve factual issues regarding the plea, and after the hearing, issue an order directing the Board to act as set forth in paragraph 2, above;

4.    Grant Petitioner the opportunity to orally argue in support of his petition;

5.    Allow Petitioner an opportunity to develop or to offer additional evidence;

23

6.    Once a release date is set, apply all excess credits towards Petitioner's maximum parole period, and grant a discharge free and clear of parole nunc pro tunc; and

7.    Grant such other and further relief as justice may require.

Dated:  6/11/07                              Respectfully Submitted,

LAW OFFICES OF PICONE & DEFILIPPIS

By:  _____
STEVE M. DEFILIPPIS
Attorneys for Petitioner,
EMERY MILLER

24

**VERIFICATION**

I am the attorney for Petitioner in the above-entitled matter, and my practice is located in Santa Clara County.  Petitioner, Emery Miller is currently in custody in Monterey County.  Additionally, I am personally familiar with the facts and circumstances underlying the present Petition, and for these reasons, am providing this Verification in accordance with the *California Code of Civil Procedure* § 446.  I have read the foregoing Petition for Writ of Habeas Corpus and know the contents thereof.  The same is true of my own personal knowledge, except as to those matters stated upon my information and belief, and as to those matters I believe them to be true.

I declare under of perjury that the foregoing is true and correct, executed this 11th day of June, 2007, in the City of San Jose, County of Santa Clara, State of California.

STEVE M. DEFILIPPIS

25